*82 OPINION OF THE COURT
Brian D. Burns, J.
Introduction
Brenda Davis petitioned the Court for visitation of her granddaughter, Dakota. Mrs. Davis has had a close relationship with the girl, now two, from the moment of her birth to Mrs. Davis’ son, Terry, and his then-girlfriend, Kira Robinson. However, at different points visitation has been interrupted because of various circumstances, especially the vagaries of Mrs. Robinson’s relationships with Mr. Davis (now incarcerated) and with her new husband.
During the last visit between Mrs. Davis and Dakota, in December 2000, the child, who is lactose intolerant, broke out in hives. Subsequently, Mrs. Robinson has refused visitation for Mrs. Davis except in Mrs. Robinson’s home. As a result, Mrs. Davis filed a petition for custody.
A hearing was held on March 15. Mrs. Davis, Terry Davis, and Mrs. Robinson all testified. Based on that testimony, and the case law discussed below, the Court makes the following findings of fact and reaches the following conclusions of law.
Discussion
New York law explicitly authorizes grandparents to seek judicial assistance in obtaining visitation. (Domestic Relations Law § 72.) Under that statute, grandparents have standing to petition for visitation where either parent is deceased or “where circumstances show that conditions exist which equity would see fit to intervene.” If the grandparent makes that hurdle, the court, in resolving the visitation dispute, “may make such directions as the best interest of the child may require” (id.).
However, the landscape changed with the United States Supreme Court’s recent decision in Troxel v Granville (530 US 57 [2000]). There, the Court struck down a Washington statute providing that any person may petition the court for visitation at any time, and the court may order visitation if that is deemed in the best interests of the child. Although the statute itself dealt with any third-party request for visitation, the particular case happened to involve grandparents.
The Court held that the Washington statute unconstitutionally violated the substantive due process rights of parents to the care, custody, and control of their children. Specifically, the statute “directly contravened the traditional presumption that *83 a fit parent will act in the best interest of his or her child.” (Id. at 69.) The Court held that “so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent’s children.” (Id. at 68.)
The first question Troxel presents is the constitutionality of New York’s Domestic Relations Law § 72, concerning grandparent visitation. In the wake of Troxel, one New York court, the Supreme Court in Kings County, held this statute unconstitutional. (Hertz v Hertz, 186 Misc 2d 222 [Sup Ct 2000]; but see Fitzpatrick v Youngs, 186 Misc 2d 344 [Fam Ct 2000] [postTroxel case upholding Domestic Relations Law § 72]; Smolen v Smolen, 185 Misc 2d 828 [Fam Ct 2000] [same].) The Hertz court held that because the law “contains no requirement that a court accord a parent’s decision any presumption of validity and permits the court to impose its own best interests standard” (id. at 226), it violates the plain dictate of Troxel.
We take a different approach. It is true that Domestic Relations Law § 72 confers standing wherever “equity would see fit to intervene” and authorizes the court to “make such directions as the best interest of the child may require.” On its face, the statute does not dictate any deference to the choices of a parent. Moreover, New York courts have generally not interpreted the statute to require that special weight be given to the preference of a parent. (See, e.g., Lo Presti v Lo Presti, 40 NY2d 522, 527 [1976] [“the question of whether visitation should be granted * * * must, in the final analysis, be determined in the light of what is required in the best interest of the child”]; Matter of Wenskoski v Wenskoski, 266 AD2d 762, 764 [3d Dept 1999] [same].) So interpreted, the statute may indeed run afoul of Troxel.
However, a venerable canon of construction, endorsed by the Court of Appeals, requires that a “statute should be construed when possible in [a] manner which would remove doubt of its constitutionality.” (People v Barber, 289 NY 378, 385 [1943].) Here, courts can remove doubt as to the constitutionality of Domestic Relations Law § 72 by requiring that special weight be accorded the preference of parents. If a parent opposes grandparent visits, this preference must be respected absent extraordinary circumstances.
Troxel explicitly contemplates that a state may permit grandparent visitation, over the objections of a parent, in *84 extraordinary circumstances. (530 US at 67-72.) As long as Domestic Relations Law § 72 is interpreted to give special weight to the wishes of parents, and permit grandparent visitation over parental objection only in extreme cases, the statute conforms to the Supreme Court decision.
This approach not only comports with federal law, but also finds support in our Court of Appeals. In Matter of Bennett v Jeffreys (40 NY2d 543, 545 [1976]), the Court held that, in custody disputes between a biological parent and someone else, the biological parent must be afforded custody “[a]bsent extraordinary circumstances.” Our interpretation of Domestic Relations Law § 72 achieves the same dual effect as Bennett v Jeffreys: It recognizes the primacy of parents, while leaving open the rare case where such primacy must give way.
The question in the present case, then, is whether Mrs. Davis established extraordinary circumstances that justify deviating from the wishes of the parent. Accordingly, we now turn to the evidence presented at the hearing.
Based on Mrs. Davis’ highly credible testimony, which was bolstered by the testimony of her son and largely uncontroverted by the testimony of Mrs. Robinson, the Court finds that Mrs. Davis has been a loving and devoted grandmother literally from the beginning. Upon the birth of Dakota, she cut short a vacation to take a long car trip to see her new granddaughter and assist the parents. Ever since, she has continued to do everything possible to promote the well-being of the girl. This includes late night trips to supply diapers and formula, and assorted other financial, emotional, and physical support for both Dakota and her parents. Mrs. Davis has visited with the child extensively, often keeping her for weekends, and cared for her for a more extended period when Mrs. Robinson suffered postpartum depression.
Mrs. Robinson put an end to visitation outside her home after the child broke out with hives during a visit with Mrs. Davis. However, there is no evidence from which to conclude that Mrs. Davis was at fault. Moreover, she handled the situation in an entirely responsible manner — immediately calling Mrs. Robinson, taking the child to a doctor when Mrs. Robinson wasn’t in, then calling her immediately afterwards. Far from demonstrating any neglect, the hives episode illustrates Mrs. Davis’ commitment to Dakota.
Mrs. Robinson maintained that the hives resulted from the child’s lactose intolerance, and was triggered by Mrs. Davis serving her ice cream. There is no evidence either that the *85 hives were caused by this condition or that Mrs. Davis, in fact, served Dakota ice cream. But any concern on this point should be alleviated by Mrs. Davis’ testimony that she will not serve the child milk or milk products and would be happy to consult a pediatrician about Dakota’s condition.
At the hearing, Mrs. Robinson expressed other concerns about visitation at Mrs. Davis’ home. First, she maintained that the porto-crib used there is unsafe. Second, she expressed concern that one of Mrs. Davis’ sons, who lives with Mrs. Davis, has a drinking problem and might drink in the presence of the child. Third, she was unsure who would watch Dakota when Mrs. Davis is at work.
However, Mrs. Robinson admitted that she never expressed these concerns directly to Mrs. Davis. We believe it abundantly clear that Mrs. Davis would not create an unsafe environment during visitation, and would accommodate any reasonable wishes of Mrs. Robinson.
Finally, Mrs. Robinson maintains that the girl’s father, Terry Davis, son of Mrs. Davis, wrote her several letters from prison complaining about the conditions at Mrs. Davis’ home. However, the letters were not entered into evidence and Mr. Davis directly testified that his mother cares deeply for the child and is painstakingly responsible in her care of the child.
In short, the Court finds that Mrs. Davis is an exceptionally devoted grandmother. Mrs. Robinson’s misgivings about visitation appear to have been influenced by her volatile relationship with Mr. Davis, and the attitude of her new husband, Mr. Robinson. At any rate, the Court finds that Mrs. Davis has done nothing to justify the termination or severe restriction of visitation.
Moreover, while the Court does not find that Mrs. Robinson . is unfit, there is ample evidence that she finds parenting difficult. The Department of Social Services has apparently opened a preventive case to provide her parenting services, and has investigated several abuse or neglect charges against her. At least one allegation was determined to be founded. Mrs. Robinson, who is only 19 years of age and currently pregnant, has asked Mrs. Davis for various kinds of assistance with Dakota. All of this contributes to the Court’s view that a significantly reduced role for Mrs. Davis in her granddaughter’s life would be seriously detrimental to the child.
Conclusion
Troxel dictates that a parent’s feelings about grandparent visitation warrant “special weight.” (530 US at 69.) The *86 Court acknowledges Mrs. Robinson’s preference, and accords it the weight required by Troxel. However, the Court finds extraordinary circumstances sufficient to overcome that special weight and award Mrs. Davis some visitation.
As it happens, the present case involves none of the circumstances which New York courts have cited when rejecting a parent’s resistance. First, Mrs. Davis and her family have a strong and long-standing bond with Dakota, who might suffer if it were severed. (See People ex rel. Sibley v Sheppard, 54 NY2d 320, 328-339 [1981].) In addition, the parent’s concerns about visitation appear pretextual. (See Kenyon v Kenyon, 251 AD2d 763, 764 [3d Dept 1998].) In any case, they are easily addressed by an appropriate order.
A further circumstance is present as well — the incarceration, for several years to come, of the child’s father. Mrs. Davis, in addition to all her other attributes as a care-giver, maintains a link between the child and her father, as well as the father’s side of the family generally. Mrs. Robinson’s withholding of visitation from Mrs. Davis effectively ended the child’s contact with her paternal aunt and cousins as well. Fostering those relationships is yet another benefit to be gained by renewed visitation with Mrs. Davis.
We endorse the suggestion, tendered by the Law Guardian in closing argument, that a child cannot be loved by too many people. Mrs. Davis’ love for Dakota is a wholly positive force that should be nurtured rather than jeopardized.
That said, the Court is mindful of the admonition in Troxel to accord special weight to a parent’s desires. The order to follow is crafted with this in mind. It addresses and should resolve the particular concerns Mrs. Robinson has expressed about visitation at Mrs. Davis’ home.
For the reasons stated above, it is ordered that
(1) Mrs. Davis shall have visitations at her home every third weekend, from Friday at 7:00 p.m. until Sunday at 5:00 p.m., beginning March 23, 2000. She will be responsible for transportation;
(2) During said visits, there shall be no consumption of alcohol in Mrs. Davis’ home;
(3) During said visits, there shall be appropriate adult supervision of Dakota;
(4) Mrs. Davis shall supply suitable bedding for Dakota that accords with the wishes of Mrs. Robinson.